# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DONOVAN GEORGE DAVIS and DIANA
ELEISE DAVIS ,**

                         **Plaintiffs,**

-vs-                                           **Case No.  6:03-cv-1519-Orl-31KRS**

**PHILIP B. WILLIAMS and DEPUTY E.
BECHT,**
                          **Defendants.**

_____

# ORDER

This matter comes before the Court on Defendants, Philip B. Williams' ("Williams") and E. Becht's ("Becht") (collectively referred to, where appropriate, as "Defendants") Motion for Summary Judgment (Doc. 65), and Plaintiffs, Donovan George Davis' ("Davis") and Diana Elise Davis' ("Diana Davis") (collectively referred to, where appropriate, as "Plaintiffs") Response thereto (Doc. 75).  The Court has carefully considered the arguments made by both parties in their pleadings.

**I.**      **Background**

A. The Parties

Plaintiff Donovan Davis was, at all times relevant to this action, a resident of Brevard County, Florida.  Diana Davis is Donovan Davis' wife.  Williams was the Sheriff of Brevard County, and Becht was a deputy employed by the Brevard County Sheriff's Office ("BCSO").

B. Factual Background

This case arises out of events that occurred on the evening of March 30, 2003, in Brevard County, Florida.  On that evening, Becht was on patrol for the BCSO.  (Doc. 67, Attachments 2-7, Deposition of Becht, at 24).[1]  Becht was accompanied by Deputy Barrett Bright ("Bright") (Bright and Becht will be collectively referred to, where appropriate, as the "Deputies").  (*Id*. at 26). Becht was Bright's field training officer.  (*Id*. at 51).  At approximately 8:00 p.m., the Deputies initiated a traffic stop on Babcock Street in an area roughly 500 yards north of Davis Lane.[2]  (*Id*. at 25, 31; Doc. 67, Att. 8-11, Depo. of Bright, at 48).  Becht determined that a vehicle was speeding, so he and Bright initiated their overhead lights, siren and horn.  (Doc. 67, Attachments 2-7, Deposition of Becht, at 26).  The driver initially refused to stop, but finally stopped approximately 300 yards into Davis Lane, a distance of approximately 800 yards from where the traffic stop was first initiated.  (*Id*. at 26-7, 29).  Once the vehicle stopped, Bright approached the driver and began asking the driver for general information, while Becht positioned himself on the passenger side of the vehicle.  (*Id*. at 30-1).  Becht assisted Bright in writing the citation.  (*Id*. at 51).

---

[1] The depositions filed at Doc. 67 were filed in a form such that there are four deposition pages contained on each single printed page.  Thus, page citations are to the actual deposition page, not to the single page containing four deposition images.

[2] Davis Lane dead ends into a private residential home, the only home on that street.  There is some dispute as to whether Davis Lane is a public or private drive.  Becht asserts that it is a public street (Doc. 67, Att. 2-7, Depo. of Becht, at 25, 27), whereas Donovan Davis asserts that it is a private drive (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 66; *see also* Doc. 67, Att. 23-30, Depo. of Diana Davis, at 122).  Viewing the evidence in Donovan Davis' favor, the Court finds that Davis Lane is a private drive.  Davis Lane is 1,000 feet long, and is wide enough for two cars.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 103-4).

While the Deputies were obtaining information from the driver, two men approached the front of the vehicle the Deputies had stopped. (*Id*. at 31). Becht was not aware of the location from where these men had come. (*Id*. at 31-3).[3] According to Becht, while these men approached, and while they were approximately 30 yards away, one of them was yelling. (*Id*. at 35-6; see also Doc. 67, Att. 8-11, Depo. of Bright, at 52 ("they just showed up in the guy's headlights and started yelling to us, 'What are you doing here.'")). Because Bright was the one who had initiated the traffic stop, and because Becht was unable to clearly hear what this individual was saying, Becht began walking towards the two men. (Doc. 67, Attachments 2-7, Deposition of Becht, at 35-6).

There is a dispute as to what happened next. Viewing the evidence presented in the manner most favorable to Davis, the following is the Plaintiffs' version of the events as they occurred.

The Plaintiffs were hosting a family get-together at their home, at which approximately 30 or 35 people were present. (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 55, 57). Although the Plaintiffs were serving alcohol, neither of them consumed any alcoholic beverages that night. (*Id*. at 86; Doc. 67, Att. 23-30, Depo. of Diana Davis, at 89). At approximately 8:00 p.m., Davis passed through his family room, looked through his glass front door, and saw a flashing light in front of his house, which he recognized as a law enforcement vehicle. (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 106-8). Davis became afraid because he didn't know if anything was wrong, so he went and got Patrick Harrack ("Harrack"). (*Id*. at 108). At that time, Davis did not notice if

---

[3] At that time, the only lights in the area were the blue lights on the Deputies' car, the headlights on the Deputies' car, and the headlights of the car the Deputies had stopped. (Doc. 67, Att. 2-7, Depo. of Becht, at 33-4).

there was another vehicle in front of the law enforcement vehicle.  (*Id*. at 120).  Davis, accompanied by Harrack, walked out of his house, and down the driveway toward the law enforcement vehicle, which was located "[a]bout 250 feet" away from the house.[4]  (*Id*. at 120, 121).  When he was about 250 feet away from his house, he raised his hands and said to the Deputies, "Officer, I'm the homeowner.  What's the problem?"  (*Id*.).  At that time, Davis did not know why the Deputies were there, but he could see that the BCSO vehicle had its blue lights flashing and its headlights on.[5]  (*Id*. at 124, 126).  At the time he was approaching the Deputies, there were other cars coming up Davis Lane toward the Plaintiffs' house.  (*Id*. at 126).

As Davis approached the area where the BCSO vehicle was located, at first he only saw Becht, not Bright, and saw that Nigel Dottin was in the vehicle which had been stopped.  (*Id*. at 130, 132).  After Davis identified himself as the homeowner and asked what the problem was, the following exchange occurred:

> [Becht] said to [Davis], "Get away from here."
> [Davis] said, "Officer, I live here."
> [Becht] said, "Leave now."
> And [Davis] said, "Officer, what's wrong?"
> And [Becht] said it again . . . .[6]

---

[4] As he approached the scene, Davis recognized the law enforcement vehicle to be a BCSO vehicle.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 125-6).

[5] Harrack, however, states that as he and Davis approached the vehicles, they had a conversation where they said, "it seem like they pull over a car," and that Davis made a statement to Harrack that it seemed like the police had pulled somebody over.  (Doc. 67, Att. 31-35, Depo. of Patrick Harrack, at 78, 91).

[6] Becht told Davis to get away three times, and Davis walked away after the third time.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 138-9).  Davis was told that he would be arrested if he did not leave the area.  (Doc. 67, Att. 31-35, Depo. of Patrick Harrack, at 136).

(*Id*. at 133).[7]   At that point Davis was about 10 feet away from the area where the traffic stop had

occurred.[8]   (*Id*. at 134).   After the exchange with Becht, Davis turned and, with Harrack, began

walking back toward his house.[9]   (*Id*. at 133-34).   During this first exchange, Becht did not tell

Davis that he was conducting a traffic stop.[10]   (*Id*. at 139).

As Davis began walking away, he saw that cars were driving toward a lake located on his

property, so he walked back to where the traffic stop was occurring and began to speak to Becht,[11]

(*Id*. at 134-35), at which point the following exchange occurred:

> [Becht] said, "Leave now or I'll arrest you."   And he said it a couple times, "I'll
> arrest you."
> And [Davis] said, "Arrest me for what?"
> And [Becht] says, "Leave now."
> [Davis] turn[ed] around again, the second time, with [Harrack] and he keeps saying
> it, and [Davis] said, "I need to talk to your boss."[12]

---

[7] Davis characterizes Becht's voice as "screaming" and "shouting." (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 143).

[8] Becht states that the distance during both the first and second exchange was approximately thirty yards. (Doc. 67, Att. 2-7, Depo. of Becht, at 64).

[9] Harrack states that Davis appeared upset after this first exchange. (Doc. 67, Att. 31-35, Depo. of Patrick Harrack, at 88, 95).

[10] Becht states that Davis was yelling as he approached Becht and Bright, so Becht walked over, explained who he was, why he was there, and told Davis that the Deputies were conducting a traffic stop. (Doc. 67, Att. 2-7, Depo. of Becht, at 39-40, 48).   Becht identified himself as a deputy sheriff, and told Davis that the Deputies were going to issue a citation and then leave. (*Id*. at 48-9).

[11] Davis and Harrack walked about fifteen or twenty feet before turning around and walking back to the scene. (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 140).   When they approached the second time, they came within fifteen feet of the scene. (*Id*. at 146).   It is clear that they went back after being told not to go back. (Doc. 67, Att. 31-35, Depo. of Patrick Harrack, at 136).

[12] Harrack states that during this exchange, Becht appeared to be upset. (Doc. 67, Att. 31-35, Depo. of Patrick Harrack, at 142).

(*Id*. at 135).[13]   Harrack asked Becht, "What's your badge number?"  (*Id*. at 141).   During this

second exchange, Becht told Davis to leave at least three times.[14]  (*Id*. at 147).   After that

exchange, Davis and Harrack began walking back toward the Plaintiffs' house.[15]  (*Id*.).   Davis

heard a jingling sound, and Becht grabbed him and pushed Davis' hand behind him.  (*Id*.).   Davis

said that his arm was hurt, to which Becht replied that he had the right to hold him.  (*Id*.)   Then

Davis noticed a second officer, who also grabbed him.  (*Id*.).   Becht grabbed Davis' right arm, and

Bright grabbed his left arm.  (*Id*. at 152).   Then Davis said that he had a "sick shoulder," at which

time Becht pushed his arm "hard way up."[16]  (*Id*. at 147, 153).   This was the only time Davis said

anything about his shoulder hurting while he was being handcuffed.[17]  (*Id*. at 160).   After Davis

_____

[13] Davis states that during this second exchange, he was neither yelling nor talking in a loud voice.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 147).  Becht states that Davis was yelling and screaming.  (Doc. 67, Att. 2-7, Depo. of Becht, at 55, 59).  Harrack states that Davis was speaking in a "demanding way," and talking in a loud voice.  (Doc. 67, Att. 31-35, Depo. of Patrick Harrack, at 98).

[14] Davis acknowledges that he was told to leave several times, but that he came back more than once, after being told to leave.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 232).

[15] Davis states that at no point did he ever tell the Deputies that they had no right to be on his property, never told them to get off his property, never told them that the driver of the vehicle they had stopped didn't do anything wrong, and never told them that they had no right to stop the driver on Davis' property.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 198-99).  Becht, however, states that after he informed Davis that the Deputies were conducting a traffic stop, Davis said that the driver was not speeding, that the driver was a party goer, and then Davis demanded that the Deputies leave the property.  (Doc. 67, Att. 2-7, Depo. of Becht, at 40).  Bright also states that the men were yelling at the Deputies to get off the property, that the Deputies had no right to be there, and no right to stop the driver.  (Doc. 67, Att. 8-11, Depo. of Bright, at 52, 56).

[16] Becht denies both that Davis told the Deputies that they were hurting his shoulder and that the Deputies placed Davis' hands behind his back in a forceful manner.  (Doc. 67, Att. 2-7, Depo. of Becht, at 69-70, 73).

[17] The Plaintiffs allege that it was the process of being handcuffed that hurt Davis' right shoulder.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 160).  Davis had injured the rotator cuff

made this statement, Becht pushed Davis' arm up further.  (*Id*. at 174).   Both Deputies pulled

Davis' arms behind his back and handcuffed him.  (*Id*. at 153).   Bright began to use his handcuffs,

but Becht stated, "I got it,", and then pushed Davis' arms up again, after which both Deputies

squeezed Davis' arms and put the handcuffs on.  (*Id*.).   Davis was not told why he was being

handcuffed.  (*Id*. at 156).   Davis did not physically resist.[18]  (*Id*. at 153).

The Deputies then each took hold of Davis' arms and walked him to their BCSO vehicle,

during which time they pulled very hard on Davis' shoulder.[19]  (*Id*. at 154-55).   Davis again told

the Deputies that they were hurting his shoulder.  (*Id*. at 160).   When they were right in front of the

BCSO vehicle, the Deputies searched Davis and then pushed him down on the ground, forcing him

to his knees.[20]  (*Id*. at 155).   Becht pushed Davis down by pushing down on Davis' shoulder "with

handcuffs behind [him]."  (*Id*. at 280).   Davis characterized Becht's behavior as "aggressive."  (*Id*.

at 280, 292).

---

of his right shoulder approximately four months prior to March 30, 2003.  (*Id*. at 160-61).  Although
he had been scheduled for surgery, the surgery was cancelled because his shoulder had healed.  (*Id*.
at 167).  Davis' doctor indicated that he was unable to tell whether there was further injury to Davis'
rotator cuff as a result of this incident.  (Doc. 67, Att. 41-42, Depo. of Dr. Edward St. Mary, at 35).

[18] Becht states that Davis was struggling by turning his head and twisting his body, was upset,
and was yelling at the Deputies.  (Doc. 67, Att. 2-7, Depo. of Becht, at 70, 73).  Bright states that
Davis was not struggling during the time that the Deputies were putting handcuffs on Davis.  (Doc.
67, Att. 8-11, Depo. of Bright, at 64).

[19] Davis also states, however, that other than the Deputies pulling him toward the BCSO car,
no other force was used during that walk to the car.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis,
at 279-80).

[20] Becht states that he did not force Davis to his knees; instead, he asked Davis to sit on the
ground next to the BCSO car.  (Doc. 67, Att. 2-7, Depo. of Becht, at 66).

Diana Davis first learned that Davis was being handcuffed when a relative ran in the Plaintiffs' house and told her. (Doc. 67, Att. 23-30, Depo. of Diana Davis, at 99). Diana Davis went out the front door of the Plaintiffs' house and approached the place where Davis was handcuffed. (*Id.* at 102). As she approached, she could see a law enforcement vehicle with its lights on, two deputy sheriffs, and Davis in handcuffs on the ground with one deputy sheriff standing over him. (*Id.* at 102-4).

While Davis was kneeling, he saw his wife approaching.[21] (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 175, 177). Becht screamed at Diana Davis not to come down there and to stop. (*Id.*). Diana Davis, however, came right down to the BCSO car, and Davis told her, "Don't leave. See what they are doing to me." (*Id.* at 178-79; *see also id.* at 186 ("When I was on the ground the second time and she was coming and Mr. Becht said, 'Stop. Don't come down here,' I did say to her, 'Don't leave, Diana. Don't leave. Look what they're doing to me.'")).[22] Other than speaking to his wife, Davis did not yell to anyone else to come and help him.[23] (*Id.* at 187-88). At that point, Becht picked Davis up off of the ground, carried him to the back door of the car, pushed him

---

[21] While Diana Davis was approaching, there were other people standing outside of the Plaintiffs' house. (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 179). These people were closer to the Plaintiffs' house than to the scene of this incident. (Doc. 67, Att. 23-30, Depo. of Diana Davis, at 107). Diana Davis estimated that ten or fifteen guests were outside. (*Id.* at 119).

[22] Diana Davis states that Davis did call her first name, but did not ask her to come to help him. (Doc. 67, Att. 23-30, Depo. of Diana Davis, at 112-13, 116).

[23] Becht states that a large crowd of about forty people were walking toward the vehicles, and that Davis was yelling for them to come help him. (Doc. 67, Att. 2-7, Depo. of Becht, at 76). Bright also states that either the driver of the vehicle they had pulled over or Davis yelled for someone to come down from the house, and that he thinks it was Davis. (Doc. 67, Att. 8-11, Depo. of Bright, at 67-8).

down on the ground again, and then Becht held his hand on Davis' head, forcing Davis down on the ground.  (*Id*. at 179).

Bright took a dog out of the BCSO car,[24] and then Becht picked Davis up again, opened the back door of the car, and pushed Davis in the car.[25]  (*Id*. at 175).  The interior of the back part of the car consisted of slippery, shiny aluminum, with no rubber mat.[26]  (*Id*. at 180).  As Davis was pushed into the car, he hit his head.  (*Id*. at 175).  Becht pushed Davis so hard that Davis slid on his side across the back part of the car and hit his shoulder on the other side of the car.[27]  (*Id*. at 175, 180).  Diana Davis looked inside the BCSO car, and could see Davis sitting on his buttocks, with his arms behind him, and thought that he looked uncomfortable.  (Doc. 67, Att. 23-30, Depo.

---

[24] Although Davis states that the Deputies "set the dog on" his wife, he also states that he never saw the Deputies use the dog in a threatening manner toward either his wife or any of the other guests.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 189).

[25] Although Davis states several times in his deposition that he was "thrown" into the back of the BCSO car, when asked to "accurately describe" how Becht put him in the car, Davis responded, "He pushed my head and it hit on the door - - on the top of the car. Then I in turn put my head down. Then he push me." (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 182).  Davis also stated, "Don't misunderstand me. They didn't actually pick me up off the ground and threw (sic) me in it." (*Id*. at 181).  Diana Davis also claims that Becht threw Davis into the car, but when asked to describe what happens, described the event as, "He just like drug him in and push him, and you could hear bangs and bumps and everything[,]" and that "he drug him over there and push him in, you know, shove him in." (Doc. 67, Att. 23-30, Depo. of Diana Davis, at 114-15; *see also id*. at 133-34).  Harrack states simply that Becht held Davis' head and pushed him in sideways.  (Doc. 67, Att. 31-35, Depo. of Patrick Harrack, at 144).

[26] Becht states that although there is no seat, there is a flat rubberized surface in the back of the car.  (Doc. 67, Att. 2-7, Depo. of Becht, at 79). There was no back seat because the BCSO car that Becht and Bright were using that night was a K-9 vehicle used for storing and transporting police dogs.

[27] Becht denies forcefully shoving, pushing or throwing Davis into the BCSO car.  (Doc. 67, Att. 2-7, Depo. of Becht, at 81).

of Diana Davis, at 127-28).  The Deputies did not tell Diana Davis why her husband was being

arrested.  (*Id*. at 124-25).

Davis was then transported in that BCSO car (the car in which the dog had been) to a bank

parking lot,[28] where two other officers were.[29]  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at

190-91; Doc. 67, Att. 23-30, Depo. of Diana Davis, at 129-30).  Davis was eventually transferred

to another patrol vehicle.  (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 190).  Davis was at

this location for approximately two hours, during which time he was in a lot of pain.[30]  (*Id*. at 192-

93).  Davis was never told why he had been arrested while at the bank parking lot, nor did he ask.

(*Id*. at 197).  At one point, Davis hit his foot against the car door several times to signal that the

officers should come over.  (*Id*. at 193).  Becht approached and asked what was wrong, and Davis

said that he needed water and then asked Becht to take the handcuffs off and to handcuff him with

his arms in front.  (*Id*.).  Becht turned Davis around, then squeezed the handcuffs so hard that

Davis' hand was cut and his thumb went numb.[31]  (*Id*.).

---

[28] Davis was brought to the bank parking lot to await the jail van.  (Doc. 67, Att. 2-7, Depo. of Becht, at 117).

[29] Becht states that other officers arrived at the scene, and that he put Davis in another patrol vehicle for transport.  (Doc. 67, Att. 2-7, Depo. of Becht, at 84).  Bright also states that Davis was transported in another patrol car.  (Doc. 67, Att. 8-11, Depo. of Bright, at 81).

[30] Becht states that it was during the time when Davis was being transported to the bank parking lot that Davis said that he had a pre-existing shoulder and back injury.  (Doc. 67, Att. 2-7, Depo. of Becht, at 83, 112).  In response, Becht allowed Davis to stand outside of the patrol car.  (*Id*. at 112).

[31] Becht states that he does not remember Davis asking him to handcuff him in front to relieve the pressure on his shoulder, and Becht flatly denies the allegation that he reached behind Davis and tightened the handcuffs.  (Doc. 67, Att. 2-7, Depo. of Becht, at 85).  Bright does not remember Becht either checking Davis' handcuffs or tightening them instead of loosening them.  (Doc. 67, Att. 8-11,

While Davis was at the jail, he complained to a nurse about his hand, telling her that it hurt and that it was numb. (*Id*. at 214). He believes that he told the nurse about his shoulder hurting, as well. (*Id*. at 215-16). After this incident, Davis' neck was swollen, and he could not move his arms. (*Id*. at 240). One or two days after this incident, Davis was diagnosed with a torn rotator cuff in his right shoulder.[32] (*Id*. at 253). In addition, after this incident, Davis' thumb was numb and swollen. (Doc. 67, Att. 23-30, Depo. of Diana Davis, at 188). Although his thumb still bothers him, he has neither seen a doctor about it nor had surgery on that area. (*Id*. at 189).

Becht states that Davis was obstructing the Deputies' traffic stop because Davis was interfering in their duties and distracting them from the driver who was stopped.[33] (Doc. 67, Att. 2-7, Depo. of Becht, at 55-6, 57, 64). Because Becht was Bright's field training officer, Becht needed to be with Bright, to watch the driver, and to ensure the safety of both Bright and the driver. (*Id*. at 57). However, the fact that Davis was yelling caused Becht to turn his back to them. (*Id*.). The second time Davis came back, both Becht and Bright turned their backs to the driver. (*Id*. at 71). Bright had been writing a ticket, but when Davis started yelling, he stopped writing. (Doc. 67, Att. 8-11, Depo. of Bright, at 54). Becht's concern was that he did not know who the driver was, what type of person the driver was, and that Becht did not like having his back turned

---

Depo. of Bright, at 86).

[32] Davis states that his shoulder was "fine" until the handcuffing occurred. (Doc. 67, Att. 12-22, Depo. of Donovan Davis, at 256, 279). Diana Davis similarly states that Davis did not have any complaints about his right shoulder at the time of the incident. (Doc. 67, Att. 23-30, Depo. of Diana Davis, at 163-64).

[33] Bright did not consider Davis to pose a threat to either Bright or Becht. (Doc. 67, Att. 8-11, Depo. of Bright, at 100).

to the driver and to Bright.  (Doc. 67, Att. 2-7, Depo. of Becht, at 121).  Bright characterized the

issue as an "officer safety issue," and states that the "safety aspect in that issue is a distraction. It's

very simple. The moment it takes to look to see why somebody is yelling at you the person that is

standing next to you could stab you or shoot you or - - you don't know that person."  (Doc. 67, Att.

8-11, Depo. of Bright, at 102-3).

Becht also states that Bright removed the dog from the BCSO car and walked with the dog

to the front of the crowd of people, which was "somewhere in front of the driver's vehicle," asked

them to stop, and then "deployed" the dog when the crowd did not stop.[34]  (Doc. 67, Att. 2-7,

Depo. of Becht, at 77-8).  Becht was concerned for the Deputies' safety because the crowd

appeared violent, almost to the point of inciting a riot because both the driver and Davis were

yelling for the crowd to come help, and the crowd was picking up their pace as they approached

the scene.[35]  (Id. at 123-24).  Then, for Davis' safety and the Deputies' safety, Becht put Davis

inside the BCSO car from which Bright had removed the dog.  (Doc. 67, Att. 2-7, Depo. of Becht,

at 78, 80; Doc. 67, Att. 8-11, Depo. of Bright, at 66).  Becht stated that the crowd was

approaching, that he didn't know what the crowd was going to do because Davis was yelling for

help, and Becht believed that by placing Davis into the BCSO car, it might help the situation by

cooling things down.  (Doc. 67, Att. 2-7, Depo. of Becht, at 80).  He arrested Davis for obstruction

---

[34] Bright also states that the Deputies told the crowd to go back to the house, but the crowd
continued to approach to within fifteen or twenty yards of the BCSO car, at which point Bright again
told them to go back to the house, but the crowd again did not return to the house, so Bright retrieved
his dog from the BCSO car and approached the crowd with the dog.  (Doc. 67, Att. 8-11, Depo. of
Bright, at 71-3).

[35] Bright states that, prior to being placed inside the BCSO car, Davis was asking the people
in the crowd to help him.  (Doc. 67, Att. 8-11, Depo. of Bright, at 76).

of justice because Davis distracted the Deputies from the driver and thus they were not able to complete the traffic citation. (*Id*. at 88). Becht states that during these events, he perceived Davis to be violent and unpredictable because of Davis' "level of yelling," and that Davis did not want to understand that the Deputies were trying to perform a traffic stop. (*Id*. at 119).

C. Claims and Arguments

*1. Claims*

The Plaintiffs filed an eight count Amended Complaint (Doc. 16), in which the claims are divided among "State Causes of Action" (Counts I - IV),[36] and "Federal Causes of Action" (Counts V - VIII). [37]

*i. State Causes of Action*

Count I, brought against Becht for false arrest and false imprisonment, alleges that Becht used excessive force in effecting an illegal arrest of Donovan Davis. Count II alleges that even if Becht had probable cause to arrest Donovan Davis, Becht acted maliciously and with wanton and willful disregard of Donovan Davis' rights when Becht used excessive force in effecting the arrest. In Count III, Diana Davis alleges that she has suffered a loss of consortium with Donovan Davis due to his injuries resulting from this incident. Count IV alleges that Becht was acting within the

---

[36] Counts I, II and III are brought against Becht in his individual capacity. Plaintiffs seek damages, compensatory damages, and punitive damages against Becht in excess of $1 million. Count IV is brought against Williams in his official capacity as Sheriff of Brevard County. Plaintiffs seek damages against Williams in excess of $1 million.

[37] Count V is brought against Becht in his individual capacity. Plaintiff seek damages against Becht in excess of $1 million, as well as attorney's fees (under 42 U.S.C. § 1988). Counts VI, VII and VIII are brought against Williams in his official capacity as Sheriff of Brevard County. Plaintiffs seek damages against Williams in excess of $1 million, as well as attorney's fees (under 42 U.S.C. § 1988).

scope of his employment with BCSO, that Williams was Becht's supervisor, and that Williams is thus liable for Donovan Davis' injuries under a theory of respondeat superior.

### ii. Federal Causes of Action

Count V alleges that Becht violated 42 U.S.C. section 1983 ("Section 1983"), in that while acting under color of law, Becht knowingly and willfully violated Donovan Davis' Fourth Amendment rights when he maliciously exercised unreasonable and excessive force against Donovan Davis. Count VI alleges that Williams violated Section 1983, in that Williams was aware of a policy, custom or practice of deputies of BCSO to aggressively stop individuals, that Williams knew that BCSO deputies stopped individuals without lawful justification, and that Williams was deliberately indifferent to these actions. Count VII alleges that Williams violated Section 1983 because pursuant to his policy, Williams assigned to duty deputies that were trained in dangerous tactics used to stop individuals, Williams failed to establish proper guidelines, procedures and training programs for BCSO deputies, Becht received improper training in these dangerous tactics, and the dangerous training Becht received contributed to Donovan Davis' injuries. Count VIII alleges that Williams violated Section 1983 because Williams failed to establish proper guidelines, procedures and training programs for BCSO deputies, pursuant to his policy Williams assigned to duty deputies that did not receive proper training in the use of force, Becht received grossly inadequate training, and the inadequate training Becht received contributed to Donovan Davis' injuries.

### 2. Arguments

Becht argues that he is entitled to summary judgment on the federal law claims because probable cause existed to arrest Donovan Davis, the force used against Donovan Davis was

reasonable, and because he is entitled to qualified immunity for those reasons.  As to the state law

claims, Becht argues that he is entitled to summary judgment because: (1) he is entitled to

immunity under Florida Statute section 768.28(9)(a) because he acted within the scope of his

employment and without bad faith, malice or willful and wanton purpose; (2) probable cause

existed to arrest Donovan Davis; (3) the force used against Donovan Davis was privileged because

it was not clearly excessive; and (4) since the false arrest and excessive force claims must fail, that

he is entitled to summary judgment on the derivative loss of consortium claim.

Williams argues that he is entitled to summary judgment on the federal law claims because

the facts do not establish that he had a policy or custom of permitting constitutional violations.  As

to the state law claim of respondeat superior, Williams argues that he is entitled to summary

judgment because Becht's actions were not unlawful.

The Plaintiffs argue that summary judgment should be denied because they have raised

genuine issues of material fact as to all of their claims.

## II.    Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine

issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d

454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to

the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the

burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929

F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347,

1352 (M.D. Fla. 2003).

When a party moving for summary judgement points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[38]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

---

[38] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

### III.    Qualified Immunity

Qualified immunity insulates government officials from personal liability in Section 1983 cases for actions taken pursuant to their discretionary authority.  *Cooper v. Dillon*, 2005 WL 653313 (11th Cir. March 22, 2005).  Such officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  The government official's actions are thus judged by the objective legal reasonableness of those actions.  *Anderson*, 483 U.S. at 639. Thus, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law."  *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995) (internal citation and quotation omitted); *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (analysis looks at "official's objective reasonableness, regardless of his underlying intent or motivation.").  Where reasonable officials could differ as to the lawfulness of the defendant official's actions, the defendant is entitled to immunity.  *Kingsland*, 382 F.3d at 1231.

The Eleventh Circuit has established a two-part analysis for qualified immunity cases. First, the defendant government official must "prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred[.]" *Id.* (internal citation and quotation omitted).[39]  Second, once the defendant establishes that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal citation and

---

[39] In this case, as Becht was on duty and was conducting a traffic stop for the purpose of issuing a citation, he was acting within the scop of his discretionary authority.

quotation omitted). In conducting this second part of the analysis, a court must determine whether the plaintiff alleged the deprivation of an actual constitutional right and, if so, then determine whether that right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Vinyard*, 311 F.3d at 1346.

The determination of whether a constitutional right was clearly established at the time of the incident must be made in the specific context of the case. *Vinyard*, 311 F.3d at 1349. "A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is 'apparent'." *Cooper*, 2005 WL 653313; *Vinyard*, 311 F.3d at 1350 (issue is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). This standard does not require that the particular conduct under scrutiny was previously found to be unlawful. *Id*. Instead, the state of the existing law must only be such that the official had a fair warning that his conduct is unlawful. *Id*; *Harlow*, 457 U.S. at 818 ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.").[40] Summary judgment based on qualified immunity is appropriate if the

---

[40] The Eleventh Circuit has identified three categories of legal warning:

First . . . whether the federal statute or constitutional provision is so clear, and the conduct is so bad, that it precludes qualified immunity even in the total absence of case law. Second, if the conduct is not bad enough that it violates a constitutional provision on its face, [a court] look[s] to case law that can be applied broadly to a number of factual situations. Third, and finally, if no broad case law is applicable, [the court] turn[s] to case law precedent that is tied to the facts.

*Kesinger v. Herrington*, 381 F.3d 1243, 1250 n.6 (11th Cir. 2004).

law at the time of the incident did not put the defendant government official on notice "that his conduct would be clearly unlawful." *Vinyard*, 311 F.3d at 1350.

## IV.    Legal Analysis - Becht

A. Federal Law Claims - Count V

Becht asserts that he is entitled to qualified immunity on the federal law claims because probable cause existed to effect Davis' arrest and because he used reasonable force in effecting that arrest.

*1. Probable Cause to Arrest*

The Fourth Amendment encompasses the right to be free from arrest without probable cause. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). The Eleventh Circuit has determined that "the standard for determining the existence of probable cause is . . . whether a reasonable man would have believed [probable cause existed] had he known all of the facts known by the officer." *Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir. 1998) (internal citation and quotation omitted).[41] For probable cause to exist, the arrest "must be objectively reasonable under the totality of the circumstances." *Id*. at 1435.

> This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. Probable cause requires more than mere suspicion, but does not require convincing proof.

---

[41] This standard is the same under both Florida and federal law. *Rankin*, 133 F.3d at 1433.

*Id.* (internal citations and quotations omitted).[42]  The subjective belief of the arresting officer is not relevant to the determination of whether probable cause exists.[43]  *Id.* at 1433.

Probable cause constitutes an absolute bar to Section 1983 claims alleging false arrest. *Rankin*, 133 F.3d at 1435.  On the other hand, "[a] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Rodriguez v. Farrell*, 280 F.3d 1341, 1345 (11th Cir. 2002).  To succeed on a Section 1983 claim, the plaintiff bears the burden of demonstrating the absence of probable cause.  *Rankin*, 133 F.3d at 1436.

Whether a particular set of facts gives rise to probable cause or arguable probable cause for arrest depends on the elements of the crime.  *Crosby*, 394 F.3d at 1333.  In this case, Davis was arrested for violating Florida Statute section 843.02, which provides:

> Whoever shall resist, obstruct, or oppose any officer as defined in s.943.10(1) . . . or other person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree . . . .

---

[42] Qualified immunity applies even if actual probable cause did not exist, as long as there was arguable probable cause for the arrest.  *Crosby*, 394 F.3d at 1332.  "Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could -- not necessarily would -- have believed that probable cause was present." *Id.*  Review of an officer's actions for qualified immunity "gives ample room for mistaken judgments." *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (internal citation and quotation omitted); *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) (officer that reasonably but mistakenly determines existence of probable cause is entitled to immunity).

[43] "No subjective belief requirement exists under either state or federal law." *Rankin*, 133 F.3d at 1434.

F.S.A. 843.02.[44]  Thus, to support a conviction under that statute, the state must prove two

elements: "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the action by

the defendant constituted obstruction or resistance of that lawful duty."  *Storck v. City of Coral*

*Springs*, 354 F.3d 1307, 1315 (11th Cir. 2003).  In Florida, it is a crime not only to oppose or

obstruct an officer in the execution of that officer's duty, but also to attempt to oppose or obstruct

the officer.  *Id*.  Normally, "physical conduct must accompany offensive words to support a

conviction under this statute."  *Francis v. State*, 736 So. 2d 97, 99 (Fla. 4th DCA 1999); *D.G. v.*

*State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995) (statute normally requires obstructive conduct rather

than offensive words).

Florida courts have upheld convictions for violations of this statute where a person was

arrested not only for yelling at officers, but for refusing to leave an area where the officers were

engaged in a legal duty and where the officers considered that person's physical presence to

constitute an obstruction or impediment to the performance of their duty.  *Wilkerson v. State*, 556

So. 2d 453, 456 (Fla. 1st DCA 1990) (person arrested not for yelling and cursing at officers, but

for refusing to leave area where officers were attempting to make arrests, because officers

_____

[44] Florida Statute section 943.10(1) provides that

"Law enforcement officer" means any person who is elected, appointed, or employed
full time by any municipality or the state or any political subdivision thereof; who is
vested with authority to bear arms and make arrests; and whose primary responsibility
is the prevention and detection of crime or the enforcement of the penal, criminal,
traffic, or highway laws of the state. This definition includes all certified supervisory
and command personnel whose duties include, in whole or in part, the supervision,
training, guidance, and management responsibilities of full-time law enforcement
officers, part-time law enforcement officers, or auxiliary law enforcement officers but
does not include support personnel employed by the employing agency.

considered her physical presence to be obstructing or impeding them in the performance of their duty); *H.A.P. v. State*, 834 So. 2d 237, 238-9 (Fla. 3rd DCA 2002) (defendant not arrested merely for cursing at officers, but for refusing to leave area where officers were attempting to execute search warrant, and because defendant's defiance resulted in delay of execution of warrant, thereby constituting "obstruction or resistance of a law enforcement officer's lawful duty").

Becht and Bright were in the process of conducting a traffic stop for the purpose of issuing a citation when Davis approached them, and were therefore clearly engaged in the lawful execution of a legal duty. The question is thus whether an officer in Becht's circumstances could reasonably have believed that Davis obstructed the Deputies in the execution of that duty.[45] Certain facts are clear. Davis and Harrack approached, by Davis' own admission, to within ten feet of the Deputies while the Deputies were conducting a traffic stop, and Davis spoke to them. Becht told Davis at least three times to leave, and also told him that he would be arrested if he did not leave the area. Davis and Harrack then began walking away, but then returned to the area where the traffic stop was occurring. At that point, Becht again told them several times to leave and threatened them with arrest, after which the Deputies approached Davis and placed him in handcuffs. The Deputies stated that Davis interfered with the traffic stop by not allowing them to complete the citation, by causing them to turn their backs on the driver, and by creating a situation that caused them concern for their safety. Even viewing the evidence in the light most favorable to Davis, the Court cannot say that Becht lacked probable cause to find that Davis' words and his two

---

[45] The issue is not whether Davis actually committed acts of obstruction or resistance, or even attempted to do so. Instead, the material issue "is whether a reasonable officer . . . could have thought the facts were such that he could reasonably conclude that [Davis] was committing, or was about to attempt, acts of obstruction or resistance." *Storck*, 354 F.3d at 1316-17.

separate approaches to the scene constituted an obstruction of the Deputies' lawful duty.[46]

Accordingly, because Becht had probable cause to arrest Davis, there was no constitutional

violation and thus Becht is entitled to qualified immunity on the Plaintiffs' claim of false arrest.[47]

*2. Use of Force*

The Fourth Amendment also "encompasses the right to be free from the use of excessive

force during an arrest." *Crosby*, 394 F.3d at 1333.[48]  The Eleventh Circuit has provided the

following standard of review for excessive use of force cases:

> [T]he 'reasonableness' inquiry in an excessive use of force case is an objective one:
> the question is whether the officer's actions are 'objectively reasonable' in light of
> the facts and circumstances confronting him, without regard to his underlying intent
> or motivation.

*Id.*[49]  Courts are "not to view the matter as judges from the comfort and safety of . . . chambers,"

but rather "must see the situation through the eyes of the officer on the scene who is hampered by

incomplete information and forced to make a split-second decision between action and inaction . .

---

[46] *See* Doc. 67, Att. 53-57, Depo. of Commander Earle Petty, at 33 (stating opinion that Davis' arrest for obstruction of justice was a lawful arrest); *see also* Doc. 67, Att. 58-60, Depo. of Commander David McCormick, at 39 (opining that Davis' arrest was lawful).  At minimum, Becht had arguable probable cause to arrest Davis.

[47] It appears that Davis was also arrested for disorderly conduct.  Having found that Becht is entitled to qualified immunity, the Court declines to address this issue, as an officer "is shielded by qualified immunity so long as [he] had probable cause to arrest . . . for *any* offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1089 n.6 (11th Cir. 2003) (emphasis in original).

[48] "The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." *Rodriguez*, 280 F.3d at 1351.

[49] Because the inquiry is one of objective reasonableness, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Jackson v. Sauls*, 206 F.3d 1156, 1170 (11th Cir. 2000).

. .” *Id.* at 1333-34; *Vinyard*, 311 F.3d at 1347 (“Use of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.”) (internal citation and quotation omitted).  Under both Florida and federal law, “a full custodial arrest is allowed even when the offense is only a misdemeanor.” *Durruthy v. Pastor*, 351 F.3d 1080, 1093 (11th Cir. 2003).[50]  Moreover, both the Supreme Court and the Eleventh Circuit have “recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.” *Crosby*, 394 F.3d at 1334 (*quoting Graham v. Connor*, 490 U.S. 386, 397 (1989)); *Rodriguez*, 280 F.3d at 1351 (“the typical arrest involves some force and injury.”).

An officer’s use of force must be judged on a case-by-case basis, and the determination of whether the force was reasonably proportionate to the need for that force involves a number of factors, including “the severity of the crime, whether the suspect pose[d] an immediate threat, and whether the suspect [was] resisting or fleeing.” *Gold*, 121 F.3d at 1446; *Vinyard*, 311 F.3d at 1347.  Using these factors, a court must balance the “necessity of the use of force used against the arrestee’s constitutional rights . . . .” *Vinyard*, 311 F.3d at 1347; *see also Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (to determine if force was objectively reasonable, courts consider a variety of factors, including “(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted.”) (internal citation and quotation omitted).

---

[50] Having decided that Becht had at least arguable probable cause to arrest Davis, it is thus clear that Becht was entitled to utilize some measure of force to effect that arrest.

Qualified immunity applies in excessive force cases "unless application of the standard would inevitably lead every reasonable officer in [the position of the defendant officer] to conclude the force was unlawful." *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (internal citation and quotation omitted). Therefore, the Eleventh Circuit adheres to the principle that the "application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Id*. at 1257.

Davis complains of a variety of acts that he contends constitute excessive force: "throwing" him into the BCSO car,[51] pushing his arms higher when he complained of pain, and tightening his handcuffs. Viewing the evidence in the light most favorable to Davis, when the Deputies first grabbed him, he stated either that his shoulder hurt or that he had a "sick shoulder," after which Becht pushed Davis' arms "way up," and then both Deputies handcuffed Davis. When Becht put Davis into the BCSO car, Becht pushed Davis by the head, during which process Davis' head hit the top of the BCSO car. Becht pushed Davis sideways into the car, hard enough that Davis slid across the interior of the car and struck the other side of the car.[52] When Davis complained of the handcuffs, Becht squeezed them hard enough to cause a laceration and to cause Davis' thumb to go numb.

---

[51] Plaintiffs also seem to claim that placing Davis in a K-9 vehicle constitutes excessive force. However, the Plaintiffs cite no authority whatsoever to that effect. It is the Plaintiffs' burden to establish a constitutional violation, and mere conclusory assertions that such an act was "egregious," "excessive," and that a "reasonable officer" would know better will simply not suffice.

[52] Plaintiffs' attempts to characterize the manner in which Davis was placed into the BCSO car as "thrown" are clearly contrary to the deposition testimony of both Donovan and Diana Davis. Although both initially state that Davis was thrown into the car, when asked to specifically describe the manner in which Becht put Davis into the car, both state that Becht pushed or shoved Davis into the car. Indeed, Davis even stated, "Don't misunderstand me. They didn't actually pick me up off the ground and threw (sic) me in it." (Doc. 67, Att. 12-22, Depo. of Davis, at 181).

The Eleventh Circuit has enunciated a fairly broad category of "de minimus" force for which that court has either granted qualified immunity or determined that no constitutional violation occurred.  *See Durruthy*, 351 F.3d at 1085, 1094 (officer pulled plaintiff to ground while struggling to pin his arms behind his back, and plaintiff was kneed in the back, after which he was handcuffed; even if force was unnecessary, it was de minimus and not unlawful, and thus did not amount to constitutional violation); *Rodriguez*, 280 F.3d at 1351-53 (officer who had no reason to know of plaintiff's pre-existing condition twisted plaintiff's arm, jerked it up to plaintiff's shoulder, and handcuffed him while plaintiff fell screaming in pain; handcuffing caused loosening of internal surgical hardware, resulting in over 25 surgeries and partial amputation of arm; under circumstances, officer's actions did not rise to level of constitutional violation);[53] *Nolin*, 207 F.3d at 1258, 1258 n.4 (force used was well within ambit of de minimus force principle where officer, pursuant to lawful arrest, grabbed plaintiff, shoved him a few feet against a vehicle, pushed knee into plaintiff's back, pushed plaintiff's head against vehicle, searched plaintiff's groin area in uncomfortable manner, and placed plaintiff into handcuffs; such minimal force would not defeat qualified immunity); *Jones v. City of Dothan*, 121 F.3d 1456, 1460-61 (11th Cir. 1997) (officers slammed man against a wall, kicked his legs apart, forced him to raise his hands above his head;

---

[53] The officer in *Rodriguez* had no reason to know of the plaintiff's pre-existing condition, because the plaintiff did not tell him, and the plaintiff's outward appearance gave no indication of such a condition, and thus the officer had no reason to know that handcuffing would seriously aggravate the plaintiff's pre-existing condition.  The court concluded that "[w]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time."  *Rodriguez*, 280 F.3d at 1353.  In the instant case, Davis only told Becht that his shoulder hurt or that he had a "sick shoulder."  Even viewing such a statement favorably to Davis, it would not give any notice that Davis' condition actually constituted a torn rotator cuff in his right shoulder which could be aggravated by handcuffing or by forcing Davis' arms upward during that process.

-26-

man suffered pain from raising hands due to prior stroke, and from kicking due to arthritic knees, and received medical treatment for knees thereafter; although force was unnecessary, force used and injury inflicted were minor, and excessive force standard would not inevitably lead officer to conclude that force was unlawful, thus officer entitled to qualified immunity); *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (pushing handcuffed individual against a wall, although unnecessary, was not plainly unlawful, and officer entitled to qualified immunity because "it was not clearly established that the amount of force he used . . . was unlawful.").

### i. Handcuffing

The Eleventh Circuit has described the technique where an officer "grabbed [an individual's] arm, twisted it around [the individual's] back, jerking it up high to the shoulder and then handcuffed [the individual]" as a "relatively common and ordinarily accepted non-excessive way to detain an arrestee." *Rodriguez*, 280 F.3d at 1351. This appears to have been the case here. Further, even though Davis told Becht that his shoulder hurt or that he had a "sick shoulder" while Becht was handcuffing him, "a police officer need not credit everything a suspect tells him[,]" particularly "when the officer is in the process of handcuffing a suspect." *Rodriguez v. Farrell*, 294 F.3d 1276, 1278 (11th Cir. 2002) ("*Rodriguez II*").[54] Although Davis subsequently had surgery to repair a torn rotator cuff, Davis had injured that same rotator cuff several months prior

---

[54] The facts in *Rodriguez II* are very similar to the instant case. There, as here, after the officer grabbed the plaintiff and commenced the handcuffing, the plaintiff advised the officer that the officer was hurting his arm, but did not specifically tell the officer that his arm was injured, and the plaintiff claimed that even if the initial handcuffing was not excessive, the continued handcuffing was. The Eleventh Circuit concluded that "[p]erhaps, if [p]laintiff before the physical part of the arrest began, had also told [the officer] that [p]laintiff's arm was injured, we would be more inclined to conclude that the Constitution required [the officer] to credit that statement. But, that is not what occurred here." *Rodriguez II*, 294 F.3d at 1278 n.3. *See also Durruthy*, 351 F.3d at 1094, n.10.

to this incident, and the Plaintiff's physician was unable to determine whether this incident caused any further injury to that rotator cuff. (Doc. 67, Att. 41-41, Depo. of Dr. Edward St. Mary, at 35). In addition, although the act of handcuffing Davis may have aggravated the symptoms related to that rotator cuff injury, there is no evidence that the handcuffing made the tear any larger. (Doc. 67, Att. 82, Affidavit of Dr. Michael Karr, at 5). Finally, William Liquori ("Liquori") opined that no excessive force was used in handcuffing Davis (Doc. 67, Att. 74-76, Depo. of William Liquori, at 27),[55] and thus the Plaintiffs cannot show that every reasonable officer in Becht's position would inevitably conclude the force was unlawful. *Nolin*, 207 F.3d at 1255. Thus, the force used in handcuffing Davis was de minimus and therefore does not rise to the level of a constitutional violation.

### ii. Putting Davis into the BCSO car

The Plaintiffs have failed to meet their burden of establishing that the manner in which Becht put Davis in the BCSO car amounts to a constitutional violation. Becht did not pick Davis up and throw him into the car; instead, he pushed or shoved him inside. While the force used during that push or shove may have been unnecessary,[56] there is no reason to believe that it falls outside the bounds of "de minimus" force as defined by the Eleventh Circuit, and thus there was no constitutional violation.

---

[55] Liquori was tendered as an expert in the use of force. (Doc. 67, Att. 74-76, Depo. of William Liquori, at 26)

[56] However, Liquori opined that given the circumstances at that time, what Becht did was "appropriate." (Doc. 67, Att. 74-76, Depo. of William Liquori, at 71)

*iii. Squeezing the handcuffs*

Painful handcuffing, without more, is not excessive force where the resulting injuries are minimal. *Rodriguez*, 280 F.3d at 1352; *see also Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (allegations of pain as a result of being handcuffed, without evidence of permanent injury, are not sufficient to support claim of excessive force). At most, Davis complains of lacerations and numbness in his thumb. However, Davis does not even indicate that he complained to Becht *after* Becht allegedly squeezed the cuffs tighter. And although Diana Davis states that after the incident Davis' thumb was numb and swollen, and continued to bother him, she also states that he did not see a doctor for that injury and that his thumb does not bother him a lot. (Doc. 67, Att. 23-30, Depo. of Diana Davis, at 188-89). These allegations do not show that the force used was anything other than de minimus, and thus that force does not rise to the level of a constitutional violation.[57]

---

[57] Handcuffing has been found to constitute excessive force in circumstances that significantly surpass those of the instant case. *See Kopec v. Tate*, 361 F.3d 772, 774, 777 (3rd Cir. 2004) (officer placed handcuffs on plaintiff that were excessively tight and failed to respond to plaintiff's repeated requests for them to be loosened; plaintiff told officer pain was unbearable, begged for officer to loosen cuffs, felt faint from pain, and lost feeling in right hand; it took officer ten minutes to loosen the handcuffs despite the severe pain they were causing and plaintiff's efforts to secure their release; as a result, plaintiff claims that he suffered permanent nerve damage to his right wrist); *Payne v. Pauley*, 337 F.3d 767, 774-75 (7th Cir. 2003) (officer grabbed plaintiff's left arm, jerked it into handcuffing position, forced her arm behind her back, slammed the handcuff down on her wrist, jerked her wrist, and tightened the handcuffs until she could not feel her hands; plaintiff protested that the handcuffs were too tight, that she could not feel her hands, and that she was in pain, but the police officers did not loosen the handcuffs or remove them until she arrived at the police station; plaintiff received treatment for bruising and swelling, other injuries, and underwent surgery for carpal tunnel injury allegedly sustained during arrest).

Having found no constitutional violation, either as to the arrest or the use of force, Becht is entitled to summary judgment on Count V.[58]

B. State Law Claims

*1. False Arrest (Count I)*

The standard for determining the existence of probable cause is the same under Florida and federal law. *Rankin*, 133 F.3d at 1433. Having determined that Becht had probable cause to arrest Davis under federal law, the Court will not repeat that inquiry here, and thus Becht is entitled to summary judgment on Count I. *See Epstein v. Toys-R-Us Del., Inc.*, 277 F. Supp. 2d 1266, 1275 (S.D. Fla. 2003) (after finding probable cause for arrest, granting summary judgment on both Section 1983 and state law claims for false arrest).

*2. Excessive Use of Force (Count II)*[59]

Under Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is "clearly excessive." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3rd DCA

---

[58] Even if the Court were to find constitutional violations for any of the three acts (initial handcuffing, placing Davis into the BCSO car, and squeezing the handcuffs), Becht would still be entitled to qualified immunity for each of those acts because the Court cannot conclude that the law was so clearly established that Becht would have been on clearly notice that what he was doing was unlawful.

[59] In their Complaint, the Plaintiffs assert that the state law claim for excessive force arose out of Becht's act of "tackling" Davis, (Doc. 16 at 1), but in their Memorandum, the Plaintiffs assert that Becht's actions in question consist of throwing Davis into the BCSO car and tightening the handcuffs, and do not mention "tackling." (Doc. 75 at 19). Clearly, then, the Plaintiffs have failed to meet their burden of producing evidence to support their initial claim, and, indeed, there does not appear to have been any testimony to the effect that Davis was ever tackled. In an abundance of caution, however, the Court will address the state law excessive use of force claim as though it were based, as expressed by the Plaintiffs in their Memorandum, on the manner in which Davis was placed in the BCSO car and on the alleged tightening of his handcuffs.

1996).  If an officer uses excessive force during an arrest, the "ordinarily protected use of force . . . is transformed into a battery."  *Id.*  However, acts which are "no more than ordinary incidents of the arrest . . . do not give rise to an independent tort."  *Lester v. City of Tavares*, 603 So. 2d 18, 19-20 (Fla. 5th DCA 1992).  Having found that the force applied by Becht did not amount to a constitutional violation, the Court has already implicitly found that such force was reasonable under the circumstances.  Thus the force was simply that force incident to a lawful arrest, and therefore did not amount to a battery.  Accordingly, Becht is entitled to summary judgment on Count II.[60]

### 3. Loss of Consortium (Count III)

A claim for loss of consortium is a derivative claim.  *Davis v. Wal-Mart Stores, Inc.*, 64 F. Supp. 2d 1176, 1181 (M.D. Ala. 1999).  Here, Diana Davis asserts her claim for loss of consortium against Becht.  (Doc. 16 at 6).  Because the Court has found that Becht is entitled to summary judgment on the underlying claims of false arrest (Count I) and excessive use of force

---

[60] In the alternative, Becht would be entitled to statutory immunity under Florida Statute section 768.28(9)(a), which provides that:

> [n]o officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

F.S. § 768.28(9)(a).  The phrase "wanton and willful" "connotes conduct much more reprehensible and unacceptable than mere intentional conduct."  *Maybin v. Thompson*, 514 So. 2d 1129, 1131 (Fla. 2d DCA 1987) (*citing Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987)).  Not only did Becht's conduct not reach such a level, but the Plaintiffs wholly failed to even address the issue of statutory immunity in their Memorandum, and therefore failed to meet their summary judgment burden.  For both of these reasons, Becht is entitled to summary judgment on this issue.

(Count II), he is likewise entitled to summary judgment on Count III.  *Stone v. U.S.*, 373 F.3d 1129, 1132 (11th Cir. 2004).

## V.     Legal Analysis - Williams

A. Federal Law Claims (Counts VI, VII, and VIII)

The Plaintiffs' Complaint contains three counts against Williams alleging that Williams instituted policies that contributed to or caused Davis' injuries.  In Count VI, Davis alleges that when Becht arrested Davis, Becht was "acting pursuant to a policy, custom and practice of the [BCSO] which encouraged officers to aggressively stop individuals without regard to their Constitutional rights . . . ."  (Doc. 16 at 9).  In Count VII, Davis alleges that Williams had a "policy of assigning deputies to duty who had received training in dangerous tactics[,]" but that "Williams failed and neglected to establish proper and adequate guidelines, procedures or training programs for his deputies."[61]  Finally, in Count VIII, Davis alleges that Williams "implemented a policy of assigning deputies to duty who had received grossly inadequate training."

A suit against a public official, such as Williams, in his official capacity, "is considered a suit against the local government entity he represents."  *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989).   The question of municipal liability under Section 1983 can only arise when it is clear that a constitutional violation of specific rights has occurred.  *Vineyard v. County of Murray*, 990 F.2d 1207, 1211 (11th Cir. 1993); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th

---

[61] "The way in which a municipal police force is trained, including the design and implementation of training programs and the follow-up supervision of trainees, is necessarily a matter of 'policy . . . .'" *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987); *see also Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir. 1994) (failure to train can be characterized as "policy" or "custom" when failure amounts to deliberate indifference).

Cir 1996) ("an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred.").  Therefore, having found that Becht did not violate any of Davis' constitutional rights, the Court will not address the issue of Williams' policies that allegedly caused or contributed to Davis' injuries.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1242 n.13 (11th Cir. 2003) (where officer's arrest and use of force were constitutionally permissible, there could be no policy or custom of the city that officially sanctioned or ordered a constitutional violation); *Rooney*, 101 F.3d at 1381.  Williams is thus entitled to summary judgment on Counts VI, VII, and VIII.

B. State Law Claim (Count IV)

In Count IV, the Plaintiffs allege that Williams is liable under a theory of respondeat superior.[62]  It is axiomatic that an "employer is responsible for the *wrongful* acts of its employee that occurred within the scope of their employment."  *McKeon v. Vaicaitis, Schorr, Richards, et al.*, 825 F. Supp. 290, 295 (M.D. Fla. 1993) (emphasis supplied); *see also Iglesia Cristiana La Casa Del Señor, Inc. v. L.M.*, 783 So. 2d 353, 356 (Fla. 3rd DCA 2001) ("Under the doctrine of respondeat superior, an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the employment and to further a

_____

[62] The Plaintiffs make this claim solely with regard to their state law claims against Becht for false arrest (Count I), excessive use of force (Count II), and loss of consortium (Count III).  (Doc. 16 at 6).  They do not raise the issue of respondeat superior liability for the alleged Constitutional violations brought via Section 1983.

purpose or interest . . . of the employer."). Because the Court has determined that Becht is entitled to summary judgment on the Plaintiffs' state law claims for false arrest and excessive use of force, Williams is entitled to summary judgment on the respondeat superior claim, as there is no underlying wrongful act for which Williams could be liable.

## VI.     Conclusion

Becht's actions do not arise to the level of a constitutional violation, and thus he is entitled to qualified immunity, and therefore summary judgment is proper as to Count V.  The standard for probable cause is the same under Florida and federal law, and thus Becht is entitled to summary judgment on Count I.  The force Becht used in effecting Davis' arrest was merely that incident to a lawful arrest, and therefore did not amount to a battery, so Becht is entitled to summary judgment on Count II.  As the consortium claim is derivative of Counts I and II, Becht is entitled to summary judgment on Count III.  Because there was no underlying wrongful act, Williams is entitled to summary judgment on the respondeat superior claim in Count IV.  Because there was no constitutional violation, Williams is entitled to summary judgment on the federal "policy" claims in Counts VI, VII, and VIII.  Accordingly, it is

**ORDERED THAT** the Defendants' Motion for Summary Judgment (Doc. 65) is GRANTED.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 5, 2005.

GREGORY A. PRESNELL<br>
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party